Burns v. City of Nashville.

R. Miles Burns *et al. v.* City of Nashville *et al.*

(*Nashville.* December Term, 1919.)

1. **MUNICIPAL CORPORATIONS.** Motion to dismiss taxpayers' suit on ground demand not made to sue in name of city properly overruled.

In view of allegations of original and first and second amended bills by taxpayers of city against its mayor, board of commissioners, and others for mismanagement, embezzlement, the letting of illegal contracts, etc., *held,* that it would have been a useless formality for complainants to have made demand on commissioners to bring suit in name of the city, so that motions of defendants to dismiss third amended bill for lack of demand on proper officials of city to bring it were properly overruled, though, which third amended bill was filed, personnel of commissioners had change, and all except one commissioner were unconnected with illegal acts alleged. (*Post, p.* 573.)

Acts cited and construed: Acts 1913, ch. 22.

2. **EQUITY.** Amended bill became part of original bill.

Third amended bill became part of original bill, and matters set up in it must be deemed and treated as incorporated in original bill, and all bills must be treated as one pleading. (*Post, p.* 573.)

3. **MUNICIPAL CORPORATIONS.** Demand on officers by taxpayer of city that they bring suit unnecessary.

Where suit by taxpayer would be antagonistic to interests of officers of the city, or circumstances are such that it cannot be brought or directed by such officers without serious embarrassment to them they are improper parties to bring it, and no demand on them by taxpayer is necessary as a condition to suing in his own name. (*Post. pp.* 574, 575.)

Cases cited and approved: State v. Mitchell, 104 Tenn., 337; Slavin v. McGuire, Ann. Cas., 1913C, 912; Mock v. Santa Rosa, 126 Cal., 330; Loder v. McGovern, 48 N. J. Eq., 275; Bartee v. Tompkins, 36 Tenn., 636; Johnson v. Brown, 21 Tenn., 327.

Burns v. City of Nashville.

4. **APPEAL AND ERROR.** Chancellor discretionary ruling that bill was not multifarious affirmed, though erroneous.

Though matters incorporated in third amended bill of taxpayers of a city against the mayor, board of commissioners, and others, charging mismanagement, embezzlement, and illegal letting of contracts, were of such nature strictly speaking as to render bill multifarious, chancellor in exercise of his discretion having ruled against defendants' objection to bill on such ground, and in view of great expense necessitated if objection should be sustained, on appeal chancellor's holding on question will be affirmed, particularly where no real prejudice resulted to defendant. (*Post, p.* 575.)

Acts cited and construed: Acts 1911, ch. 32.

5. **JURY.** Two of several defendants in bill not entitled to jury trial.

In suit by taxpayers of a city against the mayor, board of commissioners, and others on account of mismanagement, embezzlement, and the illegal letting of contracts, two defendants, a surety company and a paving contractor, *held* not entitled to trial by jury under Shannon's Code, section 6282. (*Post, pp.* 576, 577.)

Case cited and approved: Maine v. Gilman (C. C.), 11 Fed., 214.

Code cited and construed: Sec. 6282(S.).

6. **REMOVAL OF CAUSES.** Petition of paving companies, defendants in taxpayers suit, properly disallowed.

Where certain paving companies were being sued jointly by taxpayers with the commissioners of a city for recovery of money paid them on account of their performance of alleged illegal contracts which the commissioners undertook to enter into with them, their petition to have the suit as to them removed to the United States district Court was properly disallowed. (*Post, pp.* 577-580.)

Acts cited and construed: Acts 1883, ch. 114; Acts 1913, ch. 22.

Cases cited and approved: Chicago, B. & Q. R. Co. v. Willard, 220 U. S., 413; Sully v. Drennan et al., 113 U. S., 293.

7. **MUNICIPAL CORPORATIONS.** Charter of Nashville did not authorize penalty for tax delinquencies.

No penalty for delinquency in payment of taxes could be legally prescribed by authorities of city of Nashville under Nashville City Charter 1883 (Acts 1883, chapter 114), giving no authority to the mayor and city council in the premises. (*Post, pp.* 580, 581.)

Burns v. City of Nashville.

Acts cited and construed:  Acts 1913, ch. 22.

Cases cited and approved:  Augusta v. Dunbar, 50 Ga., 387;  Jefferson City v. Whipple, 71 Mo., 519;  San Antonio v. Raley, 32 S. W., 180;  Price v. Bellevue, 1 Ky. Law Rep., 276;  Burlington v. Burlington & M. R. R. Co., 41 Iowa, 134.

8. MUNICIPAL CORPORATIONS.. Commissioners authorized to remit penalties and interest on tax delinquencies.

If board of commissioners of city of Nashville, under its charter (Priv. Acts 1913, chapter 22), has power to affix penalties and interest for nonpayment of taxes, it also has power to remit such penalties by ordinance.  (*Post, p.* 581.)

9. MUNICIPAL CORPORATIONS.  Commissioners not liable for remission of penalties and interest on delinquent taxes under valid ordinance.

The board of commissioners of the city of Nashville are not liable for any penalties and interest on delinquent taxes remitted by them under a valid ordinance authorizing them so to do. (*Post, pp.* 581, 582.)

10. MUNICIPAL CORPORATIONS.  Ordinance authorizing remission of delinquent tax penalties presumed valid.

In the absence of anything to the contrary, the court will presume that an ordinance of the city of Nashville authorizing its board of commissioners to remit penalties and interest on delinquent taxes was valid.  (*Post, pp.* 581, 582.)

11. MUNICIPAL CORPORATIONS.  Commissioners not liable for remission of delinquent tax penalties and interest by comptroller.

Commissioners of city of Nashville are not liable for penalties and interest on delinquent taxes wrongfully remitted by comptroller, unless they authorized him to commit such unanthorized act, or connived at it.  (*Post, pp.* 582, 583.)

12. MUNICIPAL CORPORATIONS.  Burden on taxpayers to show illegal remission of tax penalties and interest.

Burden of proof was on taxpayers of a city, suing its mayor and board of commissioners for delinquent tax penalties and interest, to show that penalties and interest were illegally remitted by defendants, and extent of such remissions.  (*Post, pp.* 582, 583.)

13. MUNICIPAL CORPORATIONS.  Prescription of patented material for paving did not invalidate contracts.

Prescription by board of commissions of city of patented material for paving, incorparation of licensed mixture agreement in paving specifications, whereby the owner of such patented material agreed to furnish it to suchcessful bidder at specified price, and requirement from such bidder of maintenance bond guaranteeing work and material for five years, *held* not to render contracts for paving let by commissioners invalid as destroying competition, while city charter required all contracts for over $500 should be advertised and let to the lowest and most responsible bidder. (*Post*, pp. 583-590.)

Cases cited and approved: Johns v. City of Pendleton, 66 Or., 182; Saunders v. Iowa City, 134 Iowa, 132; Ford v. Great Falls, 46 Mont., 292; Tousey v. Indianapolis, 175 Ind., 295; Lacoste v. New Orleans, 119 La., 470; Reed v. Rockliff-Gibson Constr. Co., 25 Okl., 633; Holbrook v. Toledo, 28 Ohio Cir Ct., 284; Dillingham v. Mayor & City Council of Spartanburg et al., 75 S. C., 549; Barber Asphalt Paving Co. v. Louisville, 123 Ky., 687; Wilson v. Trenton, 61 N. J. Law, 599; Burkett v. City of Athens, 59 S. W., 667; Madison County v. Alexander, 116 Tenn., 685.

Case cited and distinguished: Johns v. City of Pendleton, 66 Or., 182.

Codes cited and construed: Secs. 1133-1135 (T.-S.).

14. **MUNICIPAL CORPORATIONS.** Contractors held not to have forfeited compensation because of interest of city officers.

Contractors with city of Nashville for paving and certain purchases, though members of board of commissioners and persons related to them within sixth civil-law degree were interested in contracts, in violation of Nashville City Charter (Priv. Acts 1913, chapter 22) section 16, *held* not to have forfeited their right to compensation because of irregularities in letting of contracts. (*Post*, pp. 590-602.)

Cases cited and approved: Hitchcock v. Galveston, 96 U. S., 350, 351; Gas Co. v. San Francisco, 9 Cal., 453; Columbus Water Co. v. Columbus, 15 L. R. A., 354; Moore v. New York, 73 N. Y., 238; Schipper v. Aurora, 6 L. R. A., 318; McDonald v. New York, 23 Am. Rep., 144; Gaslight Co. v. Memphis, 93 Tenn., 612; Dowell v. Portland, 13 Or., 248; Drainage Commrs. v. Lewis, 101 Ill. App., 150; Lincoln v. Village of Grant, 57 Neb., 70; Ward v. Town of

Forest Grove, 20 Or., 355; Paul v. City of Kenosha, 22 Wis., 226; Pittsburg, C. & St. L. R. Co. v. Bridge Co., 131 U. S., 371; Dawson v. Waterworks Co., 106 Ga., 696; Ida Grove v. Ida Grove Armory Co., 146 Iowa, 690; Providence v. Providence Electric Light Co., 122 Ky., 237; Forrest City v. Orgill, 87 Ark., 389; Watterson v. Nashville, 106 Tenn., 410; Beazley v. Kennedy, 52 S. W., 791.

Cases cited and distinguished: Gaslight Co. v. Memphis, 93 Tenn., 612; Land Co. v. Jellico, 103 Tenn., 320; Keenan & Wade v. City of Trenton, 130 Tenn., 71; Gas Company v. San Francisco, 9 Cal., 453; East St. Louis v. United States, 110 U. S., 321.

15. MUNICIPAL CORPORATIONS. Commissioners empowered to determine whether automobile necssary for their use.

Despite Nashville City Charter (Priv. Acts 1913, chapter 22) section 15, *held*, that it was within power of city commissioners to determine whether or not automobiles were necessary for official use of themselves and heads of various departments under them, so that, having exercised their discretion in premises without fraudulent motive, their action cannot be reviewed. (*Post, pp.* 602-604.)

16. MUNICIPAL CORPORATIONS. Commissioners had discretion to determine whether trips to deliver bonds were proper.

It was within discretion of commissioners of city of Nashville, chartered by Priv. Acts 1913, chapter 22, to determine whether trips by them to New York to deliver bonds to bank were proper and necessary, so that their expenses were properly paid by them, and are not recoverable by taxpayers. (*Post, pp.* 604-610.)

17. MUNICIPAL CORPORATIONS. Expense of commissioners on trip to deliver bonds not unreasonable.

Total of expenses of two trips to New York to deliver bonds to bankers, made by commissioners of city of Nashville, amounting to $2,815, *held* not unreasonable, particularly in view of fact that it included expense of one commissioner who went along to see how streets in New York City and Buffalo were repaired. (*Post, pp.* 604-610.)

18. MUNICIPAL CORPORATIONS. Commissioners not chargeable with entire expense of trips on account of improper items.

Commissioners of city of Nashville, who twice went to New York

City at city's expense to deliver bonds to bankers, *held* not chargeable with expense of entire trip, on account of charges for a dinner at a hotel for the bankers and a trip to Chinatown given by the mayor. (*Post*, pp. 604-610.)

Cases cited and approved: Louisville Bridge Co. v. Louisville, etc., Co., 116 Ky., 258; Railroad v. Keyes (C. C.), 91 Fed., 47.

19. **EVIDENCE.** Testimony as to complicated accounts not inadmissible because accounts not in evidence.

In suit by taxpayers of city of Nashville to recover from a commissioner and the city treasurer moneys alleged to have been embezzled, admission of testimony of auditor having charge of examination of books of city *held* not erroneous though books, records, and papers were not offered in evidence; examination having been conducted in only practical way, and commissioner and treasurer having had full opportuntiy to examine books and papers as to which witness testified, they being in vault adjoining room in which testimony was taken. (*Post*, p. 610.)

20. **MUNICIPAL CORPORATIONS.** Taxpayers, suing for embezzled moneys, not required to call embezzlers witnesses to books.

In suit by taxpayers of city against a commissioner and the city treasurer to recover moneys embezzled, complainants were not bound to call alleged embezzlers as witnesses to testify as to entries in city's books bearing on their abstractions, and not required to introduce subordinates of such embezzlers to prove entries in books and records. (*Post*, pp. 610-613.)

Cases cited and approved: Bank v. Bank, 108 Tenn., 380; Heike v. United States, 227 U. S., 131; Weakley v. Cherry Twp., 62 Kan., 867; Readfield v. Shaver, 50 Me., 36; Pine County v. Willard, 39 Minn., 125; Heppe v. John, 73 Cal., 265; Fox Dist. Twp. v. McCord, 54 Iowa, 346.

21. **OFFICERS.** Last Surety responsible for money in his hands when bond executed.

Where officers served several successive terms, giving bond with different sureties for each term, sureties on bond for last term are responsible for money in hands of officer at execution of bond, presumption being that he had in his hands moneys which he should have had at beginning of term covered by bond, and to re-

Burns v. City of Nashville.

lieve themselves such sureties must show that defalcation in fact occurred during a prior term. (*Post, pp.* 615, 616.)

22. MUNICIPAL CORPORATIONS. Abstraction of money by comptroller constituted breach of bond.

Where comptroller of city of Nashville, with assistance of employee of office and auditor, abstracted cash from office, taking its place with taxpayer's checks not entered in the books, there was breach of comptroller's officer bond to well and faithfully perform duties of comptroller agreeably to the laws, ordinances, and charter of city, rendering surety company liable. (*Post, pp.* 615, 616.)

23. APPEAL AND ERROR. Denial of jury trial to defendant harmless.

In suit by taxpayers of city of Nashville against commissioners, comptroller, and others for mismanamagement, embezzlement, and ·the making of illegal contracts, action of chancellor in refusing comptroller's surety a jury trial *held* not prejudicial to it, so that reversal could not be had therefor under Acts 1911, chapter 32, and rule 14, subsecs. 4, 6, of the Supreme Court (126 Tenn., 722, 160 S. W., ix). (*Post, pp.* 616, 617.)

Acts cited and construed: Acts 1911, ch. 32.

24. MUNICIPAL CORPORATIONS.. Embezzling officers appropriately charged with reproducing records destroyed.

At suit of taxpayers, chancellor properly decreed, against comptroller of a city, the auditor, and another, recovery of $45,0000, costs of reproducing books of city destroyed by defendants to conceal embezzlements. (*Post, p.* 617.)

25. COSTS. Transcript of testimony ordered by judge not taxable as costs.

In suit by taxpayer of city against commissioners and comptroller for mismanagement, embezzlement, and letting of illegal contracts, chancellor error in rendering decrees against all defendants for costs of transcript of portion of testimony furnished chancellor over exception of defendants by court reporter, and in taxing item as part of cost of cause; there being no provision for payment of stenographer by either party, except that contained in Thomp. Shan. Code, sections 4695, 4697. (*Post, pp.* 617, 618.)

26. INJUNCTION. Temporary injunction, not supported by proof, improperty left in force.

In suit by taxpayers of city of Nashville against commissioners and

others on account of mismanagement, embezzlement, and letting of illegal contracts, where defendant commissioners denied allegation they had purchased any properties with money belonging to city, and there was no proof offered by complainants to support it, chancellor error in not dissolving the injunction restraining the commissioners from disposing of any of their property. (*Post*, *pp.* 618, 619.)

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. —Hon. John Allison, Chancellor.

W. E. Norvell, Jr, Walter Stokes, P D. Maddin, Aust. McGugin, Hume & Cornelius, Thos. H. Malone, C. C. Trabue, A. G. Ewing, Jr., M. T. Brayan, Bradley Walker, Jordan Stokes, Jr., Parks & Bell, Pitts & McConning, J. M. Anderson, F. M. Bass and Nathan Cohn, for appellants.

W. C. Cherry, J. G. Stephenson, Laurent Brown and T. T. McCarley, for appellees.

Mr. Justice Hall delivered the opinion of the Court.

The original bill in this cause was filed on June 25, 1915, by the complainant, R. Miles Burns, comptroller of the city of Nashville, but who had been suspended from office a short time prior to the filing of the bill by the board of commissioners of the city, consisting of Hilary E. Howse, mayor and commissioner of the department of public affairs, police, and health, Lyle Andrews, commissioner of finance, lights and market house, J. M. Wilkerson commissioner of streets, sewers,

and sidewalks, Robert Elliott, commissioner of water-works street cleaning, and workhouse, and J. D. Alexander, commissioner of fire, sprinkling, and building inspection.

Said bill was filed against the city of Nashville, the aboved-named members of the board of commissioners (both in their official capacities and individually), Charles R. Myers, treasurer of the city of Nashville, and the United States Fidelity & Guaranty Company surety upon the official bonds of all the defendant officials except J. D. Alexander.

The bill alleged that complainant was a resident and taxpayer of the city of Nashville; that the defendant commissioners were charged with the general supervision of these municipality of the city of Nashville, their specifis duties being specified by its charter, which is chapter 22 of the Act (Private) of 1913.

It further alleged extravagance on the part of said officials in the use and expenditures of the funds of said city, and that the financial condition of the city had become seriously impaired by reason of the many acts of nonfeasance and misfeasance on their part.

The bill alleged that the financial affairs of the city had been handled and conducted in a grossly negligent manner, without regard to the provisions of its charter, and for the personal benefit of said commissioners, and to the great financial loss and injury of complainant and all other taxpayers; that funds of the municipality had been paid without any appropriation being made by ordinance, as required by the city's charter; that, contrary to the charter provisions, funds that were required to be kept in bank separate from the

ordinary funds of the city, were kept in a single, ordinary account, and indiscriminately chaecked against for general expenses.

The bill alleged at length various instances showing how these violations of the charter were committed for the purpose of allowing extravagant expenditures and covering up the true financial condition of the city, when a compliance with the law would have forced a check upon these extravagant and illegal expenditures.

It specifically averred that the board of commissioners had illegally erected a market house on Hay Market, by letting a contract for the construction of said market house to the contractor without due advertisement and receiving bids therefor, in violation of the city's charter, and that said contract was therefore void; that the Southern Bitulithic Company and Warren Bros. Company had illegally furnished the city bitulithic paving, and they had been paid therefor by the commissioners of the city under specifications requiring the use of a patentel article, wherein the successful bidder was required to purchase such patented article from Warren Bros. Company at a stipuated price, whereby competition in bidding for said paving was stifled and destroyed, and said specifications were prescribed by the commissioners in violation of the charter provisions of the  city; that likewise was this true as to certain bitustone paving done by the Foy-Proctor Company under similar specifications, and that these contracts were also void.

The bill prayed that proper process issue, to the end that the .parties named as defendants therein be made such, and that they be required to make answer thereto, but not under oath, which was waived; that

from time to time complainant be permitted to make additional defendants thereto upon petition or amendment, and that process issue and be served on such parties as might be so brought in, so as to give the court full and complete jurisdiction of the matters involved; and that a reference to the master be ordered to determine what amounts had been squandered, misappropriated, and lost by said defendants, or paid out on illegal or void contracts, and upon the incoming of said report that the complainant have and recovered for his use and for the use of all other taxpayers of the city said amounts from said defendants, and their respective sureties.

A motion was made by the defendants that the bill be dismissed on the ground that the court was without jurisdiction to entertain it, and that the complainant had no honest purpose in its filing, and that it was vague, indefinite, and without equity on its face.

Before this motion was acted upon certain taxpayers of the city of Nashville filed a petition, in which they asked permission of the court to become parties complainant to the cause. This petition was granted by decree of the chancellor, after which the motion of the defendants to dismiss was overrrdled, and T. J. Baily was appointed special commissioner to execute the reference ordered.

Thereafter the prayer of the bill was amended, so as to ask for an injunction restraining the commissioners and other city officials from paying any moneys on any contract theretofore made or thereafter to be made, for any work or labor performed or materials furnished

on any public works or improvements, sewers, streets, school buildings, etc., whether such contracts were made under ordinance or not, etc.,

The injunction was granted and issued in accordance with the prayer of the bill.

On July 5, 1915, the city of Nashville and the commissioners, in their official capacities, answered the bill, denying all of its allegations charging said commissioners with acts of nonfeasance and misfeasance in office, and denying that any funds of the city had been wrongfully used or spent by the officials of the city, and all illegality in the letting of contracts for the city, and the contracts for street paving and the building of the market house at Hay Market was specifically denied.

The allegation charging the illegal specifications of the patented street materials, bitulithic and bitustone, for paving, was elaborately set out, and it was specifically denied that the use of such specifications was illegal, and that the contracts for paving let under them were void.

On July 10, 1915, upon motion of the complainants, and by decree of the chancellor, an amendment to the bill was made, which alleged, upon information and belief, that the commissioners had purchaased all of their property with money belonging to the city of Nashville, and asking an injunction to restrain them from disposing of any of their property. This injunction was ordered to issue by the chancellor upon the execution of an injunction bond by complainants in the sum of $2,000.

The amendment was answered by the commissioners, who denied its allegations *in toto*.

On July 19, 1915, complainants filed an amended bill. This bill named as defendants the following additional parties, to wit: Peerless Motor Car Company, Southern Bitulithic Company, Foy-Proctor Company, and Warren Bros. Company,

It alleged, among other things, that E. O. Elliott, Company, a corporation, in which E. O. Elliott, a son of Commissioner Robert Elliott, owned a one-third interest, and in which Commissioner Elliott was also interested, was agent for the Peerless Motor Car Company, and that a representative of the home office of the Peerless Mortor Car Company came to Nashville and induced Commissioner Elliott to purchase a Peerless truck for the city, and that later the E. O. Elliott Company received secretly a commission from the Peerless Motor Car Company for the sale of said truck; that the price of said truck was $4,500, and that Commissioner Elliott connived at this scheme, so that the E. O. Elliott Company could get a commission; that the E. O. Elliott Company further did repair work for the City of Nashville, and in order to cover up its connections the work was done in the name of the Union Motor Car Company, and that Commissioner Elliott had knowledge of these transactions, which were in violation of the provisions of the city's charter, and were illegal and void.

In this amended bill the question of the use of bitulithic and bitustone paving was gone into more fully and specifically. It was alleged that the specifications contained a license agreement, under the terms of which the successful bidder purchased the patented materials from Warren Bros, Company at a specified

price; that said patented materials were specified and the license agreement inserted in order to frighten away competitors of the Southern Bitulithic Company. The bill also contained charges of fraud in the procurement of these contracts.

The bill prayed that an account be taken showing all moneys paid by the city of Nashville to Warren Bros. Company, Southern Bitulithic Company, and Foy-Proctor Company on bitulithic and bitustone paving.

On July 28, 1915, a second amended bill was filed by complainants. It made the banks of the city and George W. Stainback and Park Marshall, two new members of the board of commissioners, additional parties. It made the additional charge that the city had used special funds for general purposes, and that the banks where these moneys were deposited were liable to the city for such diversion.

This contention was subsequently abandoned by the complainants, and need not be further noticed.

On January 31, 1916, a third amended bill was filed, which made many additional parties defendants, including members of the old board of public works and their sureties, and also the sureties of certain other officials of the city, who held offices under the commission form of government.

This bill alleged, among other things, that the Broadway National Bank had sold to the city of Nashville for use in its finance department, certain fixtures in its old banking house for the sum of $1,000, notwithstanding the defendant Howse, mayor of the city, was a stockholder and director in the bank at said time, and that said sale and purchase was in violation of the

provisions of the charter of the city, and was therefore illegal and void, and the bill prayed for a decree against said Howse and his bondsmen and the bank for said sum.

The bill further alleged that the commissioners contracted with one Christman to install said fixtures at a cost of $525, without making advertisement for said work and without requiring any competitive bids therefor, in violation of the charter provisions of the city, and sought a recovery against the commissioners and their bondsmen for this item.

The bill further alleged that the R. L. Proctor Company had paved certain alleys of the city during the years 1914 and 1915, under contracts with its commissioners, amounting in all to $11,081.40; that in awarding said contracts to said company no advertisement was made nor bids received by said commissioners, as required by the provisions of the city's charter in letting contracts for more than $500, but that said commissioners fraudulently attempted to evade the provisions of the city's charter by splitting the estimates and payments for said paving up into sums under $500, and a recovery was sought against the commissioners and their sureties on their official bonds for this item.

It was further alleged that the commissioner of streets, Mr. Wilkerson, had made a contract with the Uncle Hiram Roofing Company to surface with tarvia the Broad street viaduct; that under this contract the sum of $2,335.68 was paid; that there was no advertisement made or bids received for this improvement, but the estimates and payments were split up into sums under $500, in violation of the provisions of the city's

charter, and a recovery was sought against the commissioners and their bondsmen for this item.

It was further alleged that by a similar method other tarvia paving contracts were let to the Uncle Hiram Roofing Company, on which the sum of $9,616.68 was paid by said commissioners, and a recovery was sought against them and their bondsmen for this item.

The bill further alleged that the commisioners had each purchased an automobile with funds belonging to the city, which they used for their private purposes; that no automobile was necessary for their use in the conduct of the city's business; and that complainants were therefore entitled to a recovery against said commissioners and their sureties on their official bonds for these items, as well as the cost of the upkeep of said automobiles.

The bill further alleged that, in delivering certain bonds of the city to the purchasers thereof, defendants Howse, Andrews, Wilkerson, and Myers made several trips to New York at the expense of the city; that the total expense of these trips amounted to $2,815; that said trips were unnecessary, and complainants were entitled to a recovery against said defendants and their sureties on their official bonds for this expense.

The bill further aleged that funds of the city amounting in excess of $40,000 had been embezzled by the defendant Andrews, then city comptroller, Charles Myers, city treasurer, W. L. Murray, city recorder, and J. B. West, assistant city treasurer, for which complainants were entitled to recover against them and their sureties on their official bonds and also against the commissioners of the city and their sureties.

It was further alleged that certain books and records in the finance department of the city of Nashville had been stolen or destroyed, in order to cover up the embezzlements committed by Andrews, Murray, and others, and that is would cost the city $40,000 or more, to reproduce these books, for which the complainants were entitled to recover of them and the city commissioners and their sureties.

It was further alleged that the defendants Charles Cohn and Albert Goldberg, a partnership doing business under the firm name of Cohn & Goldberg, had received from the city on illegal and void contracts, let in violation of the city's charter, the sum of $———, which sum complainants were entitled to recover of the commissioners and their sureties.

The bill sought recoveries of the commissioners and their sureties for various other items growing out of contracts alleged to have been unlawfully made by them, in violation of the charter provisions of the city, with persons with whom the city could not legally contract by reason of the relationship of the parties.

The prayer of the bill was that the reference theretofore ordered by the chancellor, if necessary, be broadened by proper decree, so as to cover and include any and all items for which said defendants and their sureties on their respective bonds might be in any wise responsible to the city by reason of their wrongful and illegal conduct, either in the collection, waste, neglect, or in the letting of contracts, the preservation or distribution of funds, or in any other manner whatsoever, and that, upon the incoming of the report of the master showing the amounts lost, squandered, spent, stolen,

or in any other manner dissipated or diverted, for which any of said defendants were liable to the city, decrees be rendered in complainants' favor for their use, as well as for the use of all other taxpayers of the city and on behalf of the city, for all moneys, with interest, due from said defendants and their sureties by reason of any acts of nonfeasance and misfeasance of said defendants.

Thereafter, on February 8, 1916, the defendants severally moved the court to dismiss this bill upon the grounds:

(1) That there had been a change in the personnel of the commissioners, and that the bill showed no valid reason, as against the new commissioners, for the failure to first make demand upon them to bring suit for the items sought to be collected under the bill; and (2) that the city of Nashville had the sole right to bring the suit; and (3) for misjoinder of parties; and (4) for multifariousness.

The chancellor sustained the motion in so far as the bill sought relief against Commissioners Stainback, Alexander, and Wilkerson for acts of misfeasance occurring while they were members of the old board of public works, but in all other respects the motion was overruled.

Thereupon, defendants filed demurrers, raising substantially the same questions, and making the additional defense that no recoveries could be had for amounts paid by the commissioners under contracts which had been executed. These demurrers were also overruled.

Thereupon all of the defendants filed answers to the third amended bill, specifically denying its allegations

with respect of the illegality of the contracts therein alleged, and the various acts of nonfeasance and misfeasance upon the part of the commissioners and the other city officials therein named, by which the funds of the city were dissipated, misappropriated and lost.

The special commissioner after taking a large volume of proof, filed his report on June 3, 1918. On the question of the alleged remission of penalties and interest on delinquent taxes, the commissioner reported that for several years it had been the custom of some of the city officials, and especially was this true of Commissioners Howse and Andrews and Coptroller Burns, to authorize the remission of penalties and interest on delinquent taxes; that this was also done at times by ordiance; but that the proof showed that the greater portion of these penalties and interest were remitted by the complainant Burns, including penalties and interest on his own taxes; that from the year 1909 to the year 1915 there was remitted approximately $84,000; that approximately $60,000 of this amount was remitted during the years 1912, 1913, 1914, and 1915; that the sum of $24,000 was remitted during the years 1909, 1910, and 1911. The commissioner did not report the amount of penalties and interest remitted by each of said defendants, and the proof does not show the extent of such remissions. Nor does it show what penalties were remitted by ordinance, nor for what years.

As to the items of bitulithic and bitustone paving upon which recoveries were sought, the commissioner

found that the price paid by the city commissioners for said paving was reasonable, and that the city received full value; but he further found that the bond required by the commissioners, guaranteeing the maintenance of said paving for a period of five years, was in violation of the provisions of the city's charter.

He found that $9,616.68 of tarvia paving contracts were let by the defendant Wilkerson, then a member of the board of public works, and before the cimmsssion form of government went into effect in 1913, to the Uncle Hiram Roofing Company, and that a portion of this was paid for after the commissiosn form of government went into effect. The warrants for the amounts thus paid were approved by the commissioners as follows:

Warrants aggregating the sum of $2,934.01 were approved by Commissioners Wilkerson, Elliott, and Howse; a warrant for $334.33 was approved by Commissioners Andrews, Alexander, and Wilkerson; and other warrants aggregating the sum of $920.20, were approved by Commissioners Wilkerson, Andrews, and Howse.

The commissioner also found that the sum $2,235.60 had been paid the Uncle Hiram Roofing Company for surfacing with tarvia the Broad street viaduct, under a contract let without advertisement, as requred by the charter of the city.

It is, however, unnecessary to further notice this item, because, by a consent decree entered on July 5, 1918, recovery for this item was abandoned by the complainants; it appearing that the city of Nashville, on account of the fact that said surfacing proved de-

fective, had recovered the cost of said improvement of the Uncle Hiram Roofing Company and its sureties.

The commissioner further reported that the sum of $11,018.40 had been paid by the commissioners to the R. L. Proctor Company for paving laid in certain alleys of the city under contract; that the cost of paving some of these alleys was less than $500, but that the cost of paving most of them exceeded $500, and that there was no advertisement made or bids received as required by the city's charter for doing said paving, but that the cost of said paving to the city was reasonable.

As to the erection of the Hay Market market house, the commissioner found; That the cost of this improvement was appropximately $17,000 which was reasonable. That its construction was accomplished in the following manner: Mr. Wilkerson, commissioner of streets, made a contract with J. M. Robertson to superintend the construction of the building for ten per cent. of its cost, and that the city inspector of buildings, who acted as architect, instructed Robertson to issue no orders for more than $500. That shortly prior to the letting of the contract the city attorney had given Mr. Elliott, one of the commissioners a written opinion advising him that the work could be done in this way without advertisement and competitive bidding.

As to the alleged illegal purchase from the Broadway National Bank of fixtures for $1,000 and the installation of same, which cost $525, the commissioner found that the costs was reasonable. He further found that no advertisement for bids was made for this purchase, or for the installation of said fixtures, and that no affidavit was made stating that none of the commis-

sioners were directly or indirectly interested in the contract, as required by the provisions of the city's charter. He further found that Commissioner Howse was a director and stockholder in the Broadway National Bank at the time said fixtures were purchased.

As to the alleged illegal purchatse of a Peerless motor truck for $4500, the commissioner found that, after due advertisement, a truck was purchased of the Peerless Motor Car Company at that price; that the E. O. Elliott Company had a secret contract as sales agent with the Peerless Motor Car Company, by which it received a commission on the sale of said truck from the Peerless Motor Car Company, under the guise of furnishing a year's service; and that E. O. Elliott, a son of Commissioner Elliott, was one of the principal stockholders and officers of the E. O. Elliott Company and that Commissioner Elliott was a director in said company, but owned no stock in said company. He further found, however, that the prooof showed that Commissioner Elliott had no knowledge at the time of the transaction that the E. O Elliott Company was to receive or had received any commission on this sale, or that it was the agent of the Peerless Motor Car Company.

The commissioner further found that payments had been made to one S. J· Underwood for painting to the amount of $2,196.70, in violation of the provisions of the city's charter, Mr. Underwood being at the time of said payments a member of the board of hospital commissioners of the city, and that the vouchers for said payments were issued by the different city commissioners.

The commissioner further found that payments had been made to Phillips & Co. for supplies purchased by the city board of education, amounting to $359.20, vouchers for which were approved by the city commissioners; that at the time these purchases were made Mr. George Phillips, an employee of the firm was a member of the hospital board, and was also a son of a member of the firm of Phillips & Co.

The commissioner also found that payments had been made to Phillips-Tolmie Company to the amount of $91.70, for supplies purchased by the hospital board, of which Mr George Phillips was a member, and was, at the time of said purchases, manager of Phillips-Tolmie Company.

The commissioner also found that payments had been ade to Remy-Nance Company amounting to $2,621.55, for supplies purchased by the city from that company, and that at the time of said purchases Thomas J. Nance was a stockholder and the secretary of said company, and was also a son of Capt. Curran, who was chief of police of the city until abont the year 1913, and that he had also been a member of the hospital board since the year 1913.

The commissioner found that purchases were made by the city, after the city form of government went into effect, from the Gray-Dudley Hardware Company, of supplies amounting to the sum of $7,542.10, vouchers for which were approved by the defendant commissioners; that Robert Dudley was a stockholder in the Gray-Dudley Hardware Company, and had been a member of the board of park commissioners since April 13, 1901.

As to the alleged expense of trips to New York by Commissioner Howse and others to deliver bonds, the commissioner found that, in selling the bonds, Commissioner Howse, Commissioner Wilkerson, and Treasurer Meyers made one trip to New York at an expense to the city of $1,150; that this sum included the cost of a dinner which they gave at the Waldorf and a trip to chinatown, and that no itemized statement of their expenses was rendered to the city, as required by the city's charter.

In an amended report the commissioner found that there was another trip made to New York, for the purpose of delivering bonds which had been sold by the city, by commissioner Howse, Mr. Dashiell, and Treasurer Myers, for which the sum of $465 was paid by the city, and in this item of expense was included dinners, cigars, taxicab fares, etc.

As to the alleged illegal purchases made by the city of the firm of Howse Bros., of which firm Commissioner Howse was a member, the commissioner found that the humane commission purchased from Howse Bros. in 1915 supplies to the amount of $269.

As to the alleged illegal purchases from the Anchor Spring & Bedding Company, the commissioner found that Commissioner Howse was a stockholder in said company, and during the years 1914 and 1915 the city hospital board purchased from said company supplies to the amount of $358.88.

On all purchases made by the city government from persons or firms in which it was alleged that parties within the prohibited decree of relationship were inter-

ested, the commissioner found that the provisions of section 16 of the city's charter, to the effect that no money should be paid under a contract with the board of commissioners, or any other city board, until such persons should under oath disclose the names of all persons interested in the contract, and no person forbidden by law had any interest in the same, were entirely ignored, except in the case of certain written contracts, until after the filing of the bill in this cause.

The commissioner further found that, as to all of said purchases made from the various parties who were in the prohibited decree of relationship, the city received full value, and that there had been no offer by the city to return any of these supplies or articles to the sellers.

As to the alleged unlawful purchases and upkeep of automobiles by the city commissioners, the commissioner found that Commissioner Howse used his car for official business, also for carrying visitors, committees, etc., around the city, and also for his own private purposes; and that the other commissioners, for whom automobiles were purchased, used them both on official business and for their private purposes. He reported the number of automobiles of all kinds purchased by the city, exclusive of fire engines, from January 1, 1910, to July 15, 1915, together with the cost thereof, which he found to be $33,644.80.

He further found that the total cost of the upkeep of all the automobiles of the city for said period amounted to $45,198.12. He further found that the number of automobiles in use by all departments of

the city numbered 28. He further found that, wherever the price of a car was more than $500, it was bought after due advertisement, in accordance with the provisions of the city's charter.

The commissioner further found and reported that the defendants Myers, Andrews, West, and Murray had abstracted or embezzled funds of the city to the amount of $71,187.79; that these embezzlements covered a period from the years 1909 to 1914, inclusive; that in the year 1909 funds of the city were embezzled by said parties to the extent of $5,266.71, $3,756.80 in 1910, $12,889.40 in 1911, $16,490.54 in 1912, $28,032.28 in 1913, and $4,755 in 1914.

The commissioner further found and reported that, in order to cover these embezzlements of the city's funds by the defendants Andrews, Myers, and West, they destroyed certain books and records of the city, and that it cost the city the sum of $45,000 to reproduce these books and records, and that the reproduction of said books and records was necessary in order to ascertain the extent of said embezzlements, and the true financial condition of the city.

Exceptions were filed to certain of the findings of the special commissioner by some of the defendants, But these exceptions were overruled by the chancellor, and the commissioner's report was confirmed.

Upon final hearing the chancellor gave recoveries against the various defendants as follows:

(1) Against City Commissioners Wilkerson, Alexander, and Elliott, for alleged remission of penalties and interest on delinquent taxes, for the sum of $45,000;

and aginst Commissioners Howse and Andrews and Treasurer Myers, who had been connected with the city since 1909, for the sum of $84,000, the full amount of the penalties and interest, which it is claimed were remitted from 1909 to 1915, inclusive.

Recoveries were also adjudged against the sureties of each of said defendants on their official bonds for the full penalties of said bonds, which were less than the amount of the remissions for which the principals were adjudged to be liable.

(2) Against all of the city commissioners and their sureties on their official bonds, Warren Bros. Company, and the Southern Bitulithic Company, for amounts alleged to have been illegally paid by the city upon bitulithic paving contracts, totaling the sum of $263,118.67.

(3) Against the city commissioners and their sureties, Warren Bros. Company, and Foy-Proctor Company, for amounts paid by the city upon alleged illegal bitustone paving contracts, for the sum of $56,184.20.

(4) Against the city commissioners and their sureties, alone, for alleged unlawful payments made upon alleged illegal contracts for tarvia paving, for the sum of $97,231.86.

(5) Against the city commissioners and their sureties and the R. L. Proctor Company for payments alleged to have been made on illegal alley paving, for the sum of $11,324.17.

(6) Against the city commissioners and their sureties, for the alleged illegal construction of the Hay Market market house, for the sum of $17,554.42, together with interest.

(7) Against the commissioners and their sureties and the Broadway National Bank, for the sum of $1,525, together with interest on said amount, for the alleged illegal purchase from said bank of fixtures and the installation of same, in violation of the provisions of the city's charter.

(8) Against the city commissioners and their sureties, for the alleged illegal purchase of a Peerless motor truck from the Peerless Motor Car Company, for the sum of $4,500.

(9) Against the city commissioners and their sureties, for alleged illegal payments made to S. J. Underwood for painting, for the sum of $2,196.70.

(10) Against the city commissioners and their sureties, for alleged illegal payments made to Phillips & Co., growing out of sales by it to the board of education, for the sum of $359.20.

(11) Against the city commissioners and their sureties, for alleged illegal payments made to Phillips-Tolmie Company for supplies purchased, amounting to $91.70.

(12) Against the city commissioners and their sureties, for alleged illegal payments made to Remy-Nance Printing Company for supplies furnished the city and its subordinate boards, amounting to $2,651.55.

(13) Against the city commissioners and their sureties, for alleged illegal payments upon purchases made of the Gray-Dudley Hardware Company, for the sum of $7,542.10.

(14) Against the city commissioners and their sureties, on account of alleged unlawful purchases and upkeep of automobiles, for the sum of $22,648.

(15) Against Commissioner Howse, Treasurer Myers, and their sureties, on account of the expense of a trip to New York in the Year, for $465, together with interest.

(16) Against Commissioners Howse and Wilkerson and Treasurer Myers and their sureties, for the expense of another trip to New York in 1915, for the sum of $1,135 and interest.

(17) Against the defendants H. K. Howse and Hilary E. Howse, partners doing business under the trade name of Howse Bros., on account of payments made for supplies alleged to have been illegally purchased from said firm by the humane commission of the city of Nashville, for the sum of $269, and interest.

(18) Against the Anchor Spring & Bedding Company, for payments made for supplies alleged to have been illegally purchased from it by the hospital board of the city, for the sum of $358.88.

(19) Against Commissioner Andrews, Treasurer Myers, and J. B. West, on account of alleged embezzlements of the city's funds, for the sum of $71,187.79, together with interest, and the defendant W. L. Murray, who was adjudged to be jointly liable with Andrews, Myers, and West to said amount, for the sum of $49,277.82, together with interest, and also against the sureties of the defendants Andrews, Myers, and Murray, to wit, United Surety.Company, Empire State Surety Company, United States Fidelity & Guaranty Company, and National Surety Company, to the extent of the penalties of their respective bonds.

(20) Against the defendants Andrews, Myers, and West, for the reconstruction and reproduction of cer-

-tain books and records of the city, which were destroyed by them, and their sureties on their official bonds, United States Fidelity & Guaranty Company, for the sum of $45,000, which amount was expended by the city in the reproduction of said books.

(21) Against all of the defendants, for the cost of the transcript of a portion of the testimony furnished to the chancellor by the stenographer, J. C. Morelock, who took the evidence in shorthand, for the sum of $905.

(22) Against the defendants George W. Stainback, Robert Ewing, George J. Tompkins and J. O. Tankard, for sums alleged to have been paid by them on account of alleged illegal paving contracts as follows:

Against the defendant Stainback, for the sum of $33,023.70, and against his surety on his official bond, United States Fidelity & Guaranty Company, for the sum of $25,000, the penalty of its bond; against the defendant George J. Tompkins for the sum of $32,703.07, and against his surety on his official bond, Fidelity & Deposit Company, for the sum of $25,000, the penalty of its bond; against the defendant Robert Ewing, the sum of $32,023.70, and against his surety on his official bond, United States Fidelity & Guaranty Company, the sum of $25,000, the penalty of its bond; and against J. O. Tankard and his surety on his official bond, United States Fidelity & Guaranty Company, for the sum of $2,440.

(23) Against the defendant J. B. West (assistant city treasurer), for $828.11; against Commissioner Andrews, for $2,002.09; and against Treasurer Myers, for $649.88, for salary overdrafts.

(24) The chancellor ordered the costs of the cause to be paid by the defendants adjudged to be liable, in proportion to the amounts of their several liabilities, but further adjudged that the entire costs should be a charge upon any and all sums realized under said decree.

From the decree of the chancellor the defendants against whom recoveries were adjudged perfected appeals to this court and have assigned errors.

It is well to state that since the appeals to this court were perfected the United States Fidelity & Guaranty Company has compromised and settled its liability, and a consent decree has been entered in this court in accordance with the terms of said settlement, and it is no longer an interested party.

Before taking up the assignments of error which go to the merits of the cause, it is necessary to dispose of certain assignments of error relating to questions of procedure.

Practically all of the defendants assigned for error the action of the chancellor in overruling their several motions and demurrers to dismiss the third amended bill, insisting that complainants, as taxpayers, could not maintain the suit, because no demand had been made upon the proper officials of the city to bring the same.

This question was not raised until after the third amended bill had been filed. The original bill and two other amended bills had been filed and answered by the defendants named therein. The original bill named as defendants the city of Nashville and its commissioners, both in their official and individual capacities.

The bill alleged various acts of nonfeasance and mis-
feasance in office upon the part of said defendants; that
they had failed to keep various trusts and special funds
separate from the ordinary funds of the city; the
fraudulent violation by said commissioners of the pro-
visions of the city's charter in the building of the Hay
Market market house; the use by said commissioners
for their individual benefit of the teams and wagons of
the city; that some of the city officials had embezzled
large sums of money from the city's treasury, and the
mutilation and destruction by some of the city officials
of certain records and documents, for the purpose of
concealing and covering up said embezzlements; the
letting of illegal contracts to certain paving companies,
which resulted in financial loss to the city and to the
taxpayers thereof, and for which the commissioners
and their bondsmen, as well as all other persons per-
sonally profiting by such violations of the provisions
of the city's charter, were liable..

The bill further alleged that, prior to its filing, com-
plainants had undertaken to have an investigation of
the books and records of the municipality, and es-
pecially those pertaining to sums of money embezzled
and expended on illegal contracts, with a view of con-
sidering steps to be taken to recover such sums to the
city's treasury, but that the defendant commissioners
had opposed the efforts of complainants and other tax-
payers to secure such investigation, and had shown
a hostile attitude to their efforts in that direction. .

The first and second amended bills made similar
charges against the officials of the city, and named as

defendants certain other parties whom it was alleged were jointly liable with said city officials. The main purpose of the filing of the third amended bill was to bring before the court the sureties of the city commissioners and certain other city officials, who had been named as defendants in the previous bill filed, and with whom it was alleged that said sureties were jointly liable.

In view of the allegations of the original bill and the first and second amended bills, under which the court acquired jurisdiction of the cause, we think it would have been a useless formality for the complainants to have made a demand on the commissioners of the city to bring suit, when one of the principal reliefs sought by the complainants was against the commissioners themselves.

But it is said by the defendants that, at the time of the filing of the third amended bill, the personnel of the commissioners had changed, and that all of the offending commissioners save one had been succeeded by commissioners who were not connected with any of the alleged acts of nonfeasance and misfeasance committed by their predecessors, and there was no reason why demand should not have been made of these new commissioners to bring the suit.

We think the court had already acquired jurisdiction of the cause at the time the third amended bill was filed The third amended bill became a part of the original bill, and the matters set up in it must be deemed and treated as being incorporated in the original bill, and all of said bills must be treated as one pleading. Gibson's Suits in Chancery, 643.

In cases where the suit would be antagonistic to the interest of the officers of the corporation, or the circumstances such that it cannot be brought and directed by such officers without serious embarrassment to them, they are improper parties to bring the suit, and no demand on them is necessary. *State* v. *Mitchell,* 104 Tenn., 337, 58 S. W. 365; *Slavin* v. *McGuire,* Ann. Cas. 1913, 912; *Mock* v. *Santa Rosa,* 126 Cal., 330, 58 Pac., 826; *Loder* v. *McGovern,* 48 N. J. Eq. 275, 22 Atl., 199, 27 Am. St. Rep., 446; McQuillin on Municipal Corporations, vol. 5, section 2601.

The first assignment of error will therefore be overruled.

It is next insisted by the defendants that the chancellor erred in denying and overruling their various motions and demurrers to the third amended bill on the ground of multifariousness.

Mr. Gibson, in his valuable work on Chancery Pleading & Practice, at section 180, states that the objection to multifariousness, and the circumstances under which it will be allowed to prevail, is, in many cases, a matter of discretion, and that no general rule can be laid down governing the subject. Speaking upon the subject, he has the following to say:

"It is not the number of the parties, nor the intricacy of the claims on the one side or the other, that renders a bill multifarious; it is their disconnection or inconsistency, or the practical inconvenience of considering them together in one suit. Whenever a series of transactions have a common root or origin, and are so connected that it is impossible to tell, in advance of the hearing, what bearing one of these transactions

may have upon another, or how the respective parties may be charged in reference to each other, embracing them all in one bill would not make t mulifarious. If the interest and liability of the defendants, though separate, flow from the same fountain, or radiate from the same center, or have a common connecting link, the joinder of such defendants and matters in the same suit is admissible. The uniting in one bill of several matters of equity distinct and unconnected, against a sole defendant, is not multifarious. Bills are not objected to on the ground of multifariousness as much as formerly, because if a demurrer for multifariousness is sustained, the court may authorize amendments directing several bills to be filed, without new process as to the parties before the court."

To the same effect are the cases of *Bartee* v. *Tompkins,* 4 Sneed, 636, and *Johnson* v. *Brown,* 2 Humph., 327, 37 Am. Dec. 556.

We are of the opinion that the matters incorporated in the third amended bill, which became a part of the original bill upon being filed, were of such a nature, strictly speaking as to render the bill multifarious; but the chancellor, in the exercise of his discretion, having ruled against the defendants' objection to the bill on this ground, and in view of the great expense that would necessarily be incurred if the objection should be sustained, the decree of the chancellor reversed, and the cause remanded, with an order that separate bills be filed, this court feels constrained to affirm the chancellor's holding on this question, especially in view of the fact that no real prejudice resulted to the defendants on account of said action. Chapter 32, Acts 1911.

It is insisted by the defendants United Surety Company and R. L. Proctor Company that the chancellor erred in refusing their request for a trial by jury.

We are of the opinion that this assignment of error is not well grounded. The statute (Shannon's Code, section 6282) provides that either party to a suit in chancery is entitled, upon application, to a jury to try and determine any material fact in dispute, and all issues of fact in any case shall be submitted to one jury.

It appears that the United Surety Company and R. L. Proctor Company were alleged in the bill to be jointly liable with the city commissioners who had answered, and under which pleadings a reference had been ordered, without any demand having been made by them for a jury. To have granted the demand of these defendants for a trial by jury would have necessitated two trials of the same matter, one by the court as to the five defendants who did not demand a jury, and one by a jury as to the two defendants who did make such demand.

We are of the opinion that the language used in the statute "either party" must be construed to mean all parties having similar interests. If the statute be construed in accordance with the contention of the defendants that any party to the litigation, regardless of whether or not his interest is similar to that of his codefendants, is entitled to a trial by a jury, in many cases great confusion would result, and it would be difficult to pronounce judgment. We are therefore of the opinion that the right of trial by jury is given to either party in the sense of an entire party complain-

ant or defendant, and it was not intended to split a single cause of action up into two separate trials, one before the court and the other before a jury.

It was held in *Maine* v. *Gillman* (C. C.), 11 Fed. 214, that the phrase "either party," as used in Act March 3, 1875, chapter 137, section 2, clause 1 (U. S. Comp. St., section 1010), providing for the removal of causes from state to federal courts and authorizing either party to remove the cause if there shall be a controversy between citizens of different states, means all the plaintiffs or all the defendants.

We are further of the opinion that in no event were the defendants prejudiced by the action of the chancellor, as will be shown later on in this opinion.

It is insisted by the defendants Warren Bros. Company, Southern Bitulithic Company, and Foy-Proctor Company, that the chancellor erred in disallowing their petition to have the suit as to them removed to the United States District Court.

We think this action was proper, in view of the fact that these companies were being sued jointly with the commissioners of the city of Nashville for recoveries of sums of money paid them on account of their performance of alleged illegal contracts, which said commissioners undertook to enter into with them. *Chicago, B. & Q. R. Co.* v. *Willard*, 220 U. S., 413, 31 Sup. Ct., 460, 55 L. Ed., 521; *Sully* v. *Drennan et al.*, 113 U. S., 293, 5 Sup. Ct., 453, 28 L. Ed. 1008.

Now, passing to the assignments of error bearing on the merits of the cause, it is insisted by the defendants Robert Elliott, H. E. Howse, J. M. Wilkerson, J. D. Alexander, Charles Myers, United Surety Company, and

Equitable Surety Company that the chancellor erred in rendering a decree against them for penalties and interest alleged to have been remitted on delinquent taxes, after the commission form of government went into effect in February, 1913. This insistence is based on the following grounds:

(1) There was no pleading to support such a decree.

(2) It was based on inadmissible proof.

(3) It was based upon an erroneous thory which was that there could be no remission by any official board.

(4) There was no proof that the city had lost anything on account of said remissions, it not appearing that the parties whose penalties and interest were remitted had become insolvent and the money could not be made out of them.

(5) That there was no proof as to what amount of penalties and interest were remitted, or authorized to be remitted, by each of said defendants.

(6) As to the Equitable Surety Company, surety for the defendant J. D. Alexander, it is insisted that there was no proof as to what amount of penalties were remitted, or authorized to be remitted, by the defendants Howse, Andrews, and Myers after October 14, 1913, the date that the bond, which the Equitable Surety Company signed, became effective.

(7) It is further insisted by the Equitable Surety Company that its bond does not cover such liability, if liability exists.

(8) The Equitable Surety Company also insists that the finding of the special commissioner, the proof, and the final decree show that Commissioner Alexander did

not remit any penalties and interest, and that therefore neither he nor his surety is liable for the same.

We are of the opinion that the allegations of the original bill, and amendment thereto, sufficiently embraced this item of recovery, but, after a careful examination of said assignment of error, we are of the opinion that the decree of the chancellor is erroneous for the following reasons:

On the question of the alleged remission of penalties and interest by said defendants the special commissioner reported as follows:

"For several years it has been the custom of many of the city officials, and especially Myers, Howse, Andrews and Burns, to authorize remission of penalties and interest on delinquent taxes. This was also done at times by ordinance of the city. The greater part, however, of these penalties and interest, was remitted by Mr. Burns, including penalties and interest on his own taxes.

"During the year 1909 to the year 1915, there was remitted approximately $84,000. The largest amount was in the year 1913. The amount during the years 1912, 1913, 1914 and 1915 was approximately $60,000; during the years 1909, 1910, and 1911, $24,000; and the amount for the year 1909 was $7,523.65, and in the year 1910, $7,595.66.

"I herewith file a schedule showing penalties and interest remitted from February 1, 1915, to July 1, 1915, as Exhibit 22, page 173, of this report."

The imposition of penalties on delinquent taxes by municipalities is not made mandatory by any statute. The charter of the city of Nashville, under which the

city acted prior to the date the commission form of government went into effect in February, 1913 (chapter 114 of the Acts of 1883), did not contain any provision giving to the mayor and city council any authority to levy or fix penalties on delinquent taxes. However, by ordinance of February 26, 1902, which is carried into McAllister & Smith's Digest of the Laws of Nashville, at sections 1347, 1348, penalties on delinquent taxes were attempted to be prescribed by the mayor and city council. The charter of 1883 was repealed by chapter 22 of the Acts (Private) of 1913, which is the charter creating the commission form of government for said city.

We are of the opinion that no penalty could be legally prescribed by the city authorities under the charter of 1883, because no authority was given the mayor and city council to prescribe a penalty for the neglect or failure to pay taxes promptly.

In 28 Cyc., pp. 1728, 1729, it is stated: "Usually a penalty for nonpayment of a tax after it is due is provided for by statute, charter provisions, or ordinance. However, the general rule is that a municipality cannot, without express authority, prescribe the penalty for neglect to pay taxes promptly"—citing *Augusta* v. *Dunbar*, 50 Ga., 387; *Jefferson City* v. *Whipple*, 71 Mo., 519; *San Antonio* v. *Raley* (Tex. Civ. App. 1895), 32 S. W., 180; *Price* v. *Bellevue*, 1 Ky. Law Rep., 276.

McQuillin on Municipal Corporations, at section 2409, also states the rule to be that a municipality cannot prescribe a penalty for failure to pay taxes promptly, unless authorized to do so.

To the same effect is the holding of the court in the case of *Burlington* v. *Burlington & M. R. R. Co.,* 41 Iowa, 134.

By section 36 of the present charter of the city (Private Acts 1913, chapter 22), it is provided as follows:

"In order to enforce collections of taxes on property or privileges when due, the board of commissioners is hereby empowered by ordinance to affix a penalty to be paid by the taxpayer," etc.

It will be noted that the charter does not undertake to levy or affix a penalty on delinquent taxes, but simply empowers the board of commissioners to do so by ordinance. It does not appear from the report of the special commissioner, nor from the proof, that any ordinance was ever passed by the commissioners affixing a penalty to be paid by delinquent taxpayers. If, however, we may assume that such an ordinance was passed by the board of commissioners, and was in existence at the time of the alleged remission of penalties and interest by the defendants, still it does not appear what penalties and interest were remitted by the defendant commissioners, or by Mr. Burns, or by ordinance, nor for what years penalties and interest were remitted by ordinance. If the board of commissioners had the power to affix penalties and interest, they had the power to remit them by ordinance.

But it is said by complainants that such ordinance, to be valid, must apply to all taxpayers alike.

This contention may be answered by saying that there is nothing in the record tending to show that such ordinance did not apply to all taxpayers alike, and

to all penalties and interest due from taxpayers for the particular year to which .said ordinance applied. It is undoubtedly true that the commissioners would not be liable for any penalties· and interest remitted under a valid ordinance authorizing them to do so. And, in .the absence of anything to the contrary, the court will presume that the ordinance was valid.

Nor do we think they would be liable for the penalties and interest wrongfully remitted by Comptroller Burns, unless they authorized him to commit such wrongful act, or connived at it. The burden of proof was on the complainants to show that the penalties and interest were illegally remitted by the defendants, and the extent of such remissions, and, having failed to carry this burden, they were not entitled to a decree on· this branch of the cause against any of the defendants.

It is next insisted, by those defendants against whom recoveries were given on account of moneys paid and received under alleged illegal contracts made by the city commissioners for bitulithic and bitustone paving, that the chancellor erred in holding said contracts illegal, because they, or the specifications on which they were based, prescribed the use of a patented material, and had incorporated in them a license agreement by which the patentee agreed to furnish to the successful bidder whoever he might be, the patented material, at a specified price per square yard, and required the successful bidder to execute a maintenance bond guaranteeing the work and materials for a period of five years, because such provisions in said contracts had the effect of stifling and destroying competition, and

therefore rendered them illegal and void under the provisions of the city's charter, which required that all contracts for amounts of more than $500 should be advertised and let to the lowest "competent and responsible bidder."

It is also insisted that the chancellor erred in rendering decrees against said defendants on account of said alleged illegal paving contracts, because the cost to the city of said improvements was reasonable, and said improvements were received and retained by the city, and there has been no offer by the city to return them.

It is not denied—in fact, we understand it is conceded—that the board of commissioners were empowered under the city's charter to let contracts for the paving of the streets of the city; but it is insisted that the contracts in question were illegal and void alone upon the grounds stated above.

We think these assignments of error must be sustained.

We are of the opinion that the prescribing of a patented material to be used in doing said paving, the incorporation of the licensed mixture agreement in the paving specifications, by which the owner of such patented material agreed to furnish it to the successful bidder, whoever he might be, at a specified price, and the requirement of the successful bidder of a maintenance bond guaranteeing the work and materials for a period of five years, did not render the contracts invalid.

While there is some conflict of authority upon the question of the right of the officers of a municipality to prescribe a patented material for street paving under a statute or charter requiring competitive bidding, the

great weight of the more recent authorities is in favor
of such right, where the owner of the patent does not
himself bid for the contract, but makes an offer to
furnish the patented material or mixture for a stipu-
lated price, on equal terms to all bidders. *Johns* v. *City
of Pendleton*, 66 Or., 182, 133 Pac. 817, 134 Pac .312,
46 L. R. A. (N. S.), 990, Ann. Cas. 1915B, 454;; *Saun-
ders* v. *Iowa City*, 134 Iowa, 132, 111 N. W., 529, 9
L. R. A. (N. S.), 392; *Ford* v. *Great Falls*, 46 Mont.,
292, 127 Pac., 1004; *Tousey* v. *Indianapolis*, 175 Ind.,
295, 94 N. E., 225; *Lacoste* v. *New Orleans*, 119 La.,
470, 44 South., 267; *Reed* v. *Rockliff-Gibson Constr.
Co.*, 25 Okla., 633; 107 Pac., 168, 138 Am. St. Rep., 937;
*Holbrook* v. *Toledo*, 28 Ohio Cir. Ct., 284; Elliott on
Contracts, section 3626; McQuillin on Municipal Cor-
porations, section 1197; Paige on Contracts, section
1050; Dillon on Muncipal Corporations, section 804.

In the note to *Johns* v. *City of Pendleton*, supra, 46
L. R. A. (N. S.), 992, the annotator makes this state-
ment:

"The majority of the late cases considering this
question with reference to paving contracts, however,
sustain the right to stipulate for a particular kind of
paving material which is controlled by a patent where
the owner of the patent files with the municipality an
agreement to furnish the material to the successful bid-
der at a stipulated price, although by statute such con-
tracts are required to be left upon competitive bidding."

In the contracts under consideration the defendant
Warren Bros. Company, the owner of the patented
material used, before bids for said contracts were asked
for, filed with the board of commissioners the license

agreement hereinbefore referred to, agreeing to furnish bitulithic mixture, the patented material used under said contracts, to the successful bidder or bidders at a stipulated price per square yard.

We do not think, therefore, that the contracts were illegal and void because the specifications prescribed the use of a patented immaterial. Nor do we think that the requirement of a maintenance bond of the success- ful bidder for a period of five years rendered the con- tracts invalid.

In R. C. L. vol. 19, section 359, it is said: "A pro- vision in a municipal contract for the construction of a public work that the contractor shall keep the same in repair for a specified period after its completion is not objectionable as cutting off full and free competi- tion in bidding, or as tending to cause the contractor to increase the amount of his bid and thus increase the burden on the general taxpayers, since the taxpayer has an ample *quid pro quo* in the added incentive to the contractor to do the work well."

This rule is supported by the holding of the court in the case of *Dillingham* v. *Mayor & City Council of Spartanburg et al.,* 75 S. C., 549, 56 S. E., 381, 8. L. R. A. (N. S.) 412, 117 Am. St. Rep., 917, 9 Ann. Cas., 829, in which it was held that the requirement of an indem- nity bond was no ground for enjoining the performance of a municipal contract at the suit of a taxpayer that the calls for bids contained a provision requiring the successful bidder to furnish an indemnity bond in a large sum, or a provision requiring such bidder to guarantee his work and keep it in repair for one year, or a provision giving the municipality the right to re-

tain for one year ten per cent. of the total amount of the contract price.

To the same effect is the holding of the court in *Barber Asphalt Paving Co.* v. *Louisville,* 123 Ky., 687, 97 S. W., 31, 9 L. R. A. (N. S.), 154, and *Wilson* v. *Trenton,* 61 N. J. Law, 599, 40 Atl., 575, 44 L. R. A. (N. S.), 540, 68 Am. St. Rep., 714.

As to the contention made by appellants to the effect that the complainants cannot recover the amounts paid by the city for paving, materials, and supplies purchased; the cost to the city being reasonable, and the city having received such paving, materials, and supplies, and has retained the same without any offer to return.

This contention is made by all of the defendants against whom recoveries were given on account of alleged illegal paving and purchases of supplies and materials in alleged violation of the city's charter, and raises pointedly the question of the right of the city to recover in all instances of fully executed contracts, whether the same are claimed by complainants to be originally invalid on account of prescribing a patented material, omission to advertise for bids, purchases from concerns in which a relative of some member of the board of commissioners, or of some subordinate board, was a member, etc.

The special commissioner found on all of these items as follows:

"It may be stated that the proof shows that the cost of bitulithic and bitustone paving to the city was reasonable as compared with the costs in other cities; that the cost of the work of R. L. Proctor in paving alleys

with granite blocks was reasonable, as was also the cost of the Hay Market market house and the Broadway Bank fixtures.''

And in an amended report the special commissioner found:

''As to exception No. 3, I find that the city of Nashville received full value for the various articles purchased from parties who were in the prohibited degree of relationship, and that there has been no effort to return any of these articles by the city, and amend my said report accordingly.''

This latter finding was based upon a stipulation of counsel. The former finding was based on stipulations and uncontradicted proof. The report, in so far as these findings were concerned, was confirmed without exception. It may be said, therefore, that this con- tention of the defendants covers the decrees rendered by the chancellor on account of:

(1) Bitulithic paving.

(2) Bitustone paving.

(3) Alley paving by the R. L. Proctor Company.

(4) Tarvia paving.

(5) Construction of the Hay Market market house.

(6) Purchases of fixtures from the Broadway National Bank and the installation of same.

(7) Purchase of the truck from the Peerless Motor Car Company.

(8) Payments to S. J. Underwood for painting.

(9) Payments to Phillips & Co. for purchases by the board of education.

(10) Payments to Phillips-Tolmie Company.

(11) Payments to Remy-Nance Printing Company.

(12) Purchases from Gray & Dudley Hardware Company.

(13) Purchases from Howse Bros.

(14) Purchases from the Anchor Spring & Bedding Company.

(15) Purchases from Cohn & Goldberg.

There was no fraud found by the special commissioner in the letting or making of any of these contracts or purchases, and there was no exception by the complainants for the lack of such finding, and the question of fraud is not involved upon this appeal. The only contracts complained of were those made in violation of charter provisions. There were none made in violation of sections 1133-1135 of Thompson's Shannon's Code. Section 1133 reads as follows:

"It shall not be lawful for any officer, committeeman, director, or other person whose duty it is to vote for, let out, overlook, or in any manner to superintend, any work or any contract in which any public municipal corporation, county, or the state, shall or may be interested, to be directly or indirectly interested in any such contract."

Section 1134 reads: "Should any person, acting as such officer, committeeman, director, or other person above referred to, be or become directly or indirectly interested in any such contract, he shall forfeit all pay and compensation therefor."

Section 1135 reads: "Such officer shall be dismissed from such office he then occupies, and be ineligible for the same or a similar position for ten years."

These sections of the Code only apply to cases where the contract is with the officers themselves. This is

manifestly true because it is provided that the officer shall forfeit all compensation. While the contracts' complained of by complainants are those let without advertising, or to some person, firm or corporation in which a relative was interested.

Section 15 of the city's charter provides as follows:

"That no commissioner or official, subordinate officer, or other employee of the city shall be connected with, or interested in directly or indirectly, any contract with the city," etc.

Section 16 provides: "But no member, officer, or employee of the board of commissioners, nor any person related within the sixth degree by the civil law to any member of said board of commissioners, or of any board created under this act, shall be, directly or indirectly, interested in any contract or work of any kind whatever under the direction of the board of commissioners or of any board created under this act or any department thereof, and any contract for work or material in which any such person shall have an interest shall be void.

"No money shall be paid at any time to any person claiming under a contract with the board of commissioners or any board created under this act, or any department thereof, until such person shall have first filed with the board his statement, under oath, disclosing the names of all persons directly or indirectly interested in the contract or the proceeds or profits thereof, declaring that no person other than named is interested, and that no person forbidden by this act has any interest in the same."

It will be noted that section 16 of the charter does not provide that any person who is or becomes directly

or indirectly interested in any contract let by the city shall forfeit all compensation received under said contract. In this respect said section materially differs from section 1134 of the Code above quoted. The contracts and purchases under consideration, therefore, do not fall within that line of cases in this state which hold that where a public officer, whose duty it is to make or let the contract on behalf of the municipality, state or county, as the case may be, undertakes to contract or deal with himself he shall forfeit all pay or compensation received under such contract. Among the cases referred to are those of *Burkett* v. *City of Athens,* 59 S. W., 667, and *Madison County* v. *Alexander,* 116 Tenn., 685, 94 S. W., 604.

In this latter case a member of the county court of Madison county sold peas to the superintendent of the county workhouse for consumption by the workhouse prisoners of the county, and brought suit to recover the reasonable value of them. The court denied the plaintiff a recovery, basing its decision upon sections 1133-1135 of the Code hereinbefore referred to. The court, in passing upon the question, said:

"The underlying principle is that no man shall be allowed to make a contract with the county, whose duty it is to pay for such contract. In other words, he cannot make a contract to pay himself out of the public treasury for any purpose."

We are of the opinion that appellants did not forfeit their right to compensation because of the irregularities in letting the contracts under consideration. We do not mean to be understood, however, as approving the manner in which the purchases were made.

We think the municipal authorities should always comply with the provisions of the charter of the city in letting contracts; but this court cannot agree with the contention of complainants that because of the irregularities in letting the contracts and making the purchases appellants forfeited all compensation received on account of the same, and that the city is entitled to retain the benefits received under such contracts and yet recover back the money paid, notwithstanding it appears that the city did not lose anything by reason of said irregularities, but received full value. We are of the opinion that to sustain the contention of the complainants would be to give the taxpayers an undue advantage, and such a holding could not be reconciled with the principles of justice and equity.

It is not claimed that the city lost anything on account of any of these alleged illegal contrants. It is not contended that the city did not receive full value on all of them, and it is conceded that the city has received the paving, supplies, and materials purchased, and has retained and still retains them without any offer to return them. How, then, has the city been injured or prejudiced by the making of these contracts? It is conceded that the city authorities had the power to make all of said contracts; the sole contention being that they were made in an unlawful manner.

We think the appellants' right to compensation under these contracts is controlled by the cases of *Gaslight Co.* v. *Memphis,* 93 Tenn., 612, 30 S. W., 25, *Land Co.* v. *Jellico,* 103 Tenn., 320, 52 S. W., 995, and *Keenan & Wade* v. *City of Trenton,* 130 Tenn., 71, 168 S. W., 1053, Am. Cas., 1918B, 519.

In the first case referred to the gas company sued the city of Memphis to recover for gas furnished for lighting its streets. Among other defenses, the city pleaded that the charter of the city provided that all contracts of every description should be in writting, should be signed by all the commissioners assenting thereto, and should be recorded in a well-bound book, open at all times for public inspection. The contracts for the last years sued on were not in writting. The complainant claimed that, notwithstanding this the city is still liable upon a *quantum meruit* on the doctrine of implied promise. This court, speaking through Judge McALISTER, said:

"The record shows that, for these years, the company furnished the gas which was consumed by the city, and that a tax was collected for its payment, but the same was diverted to other municipal purposes. The question, then, is whether the city in view of the provisions of its charter, is liable upon an implied contract or *quantum meruit* for the gas thus consumed.

" 'The doctrine of implied liability,' says Mr. Justice Fields, 'applies to cases where money or other property is received under such circumstances that the general law, independent of express contract, imposes the obligation upon the city to do justice with respect to the same. If the city obtain money of another by mistake or without authority of law, it is her duty to refund it, not from any contract entered into by her on the subject, but from general obligation to do justice, which binds all persons whether natural or artificial. If the city obtain other property which does not belong to her, it is her duty to restore it, or, if used by her, to

render an equivalent to the true owner, from the like general obligation. The law, which always intends justice implies a promise.' Dillon on Municipal Corporations, section 460.''

In that case this court further said: ''In the case of *Gas Company* v. *San Franciso,* 9 Cal. 453, it was held that 'a city is liable for gas furnished it, with knowledge of the council, though no ordinance or resolution was passed authorizing it to be furnished.'

''Says Mr. Morawetz, viz.: 'But municipalities, as well as private corporations, must account for money or other property applied by their officer to authorized uses, although the money or property so applied was received under an agreement which was wholly void.' *Hitchcock* v. *Galveston,* 96 U. S., 350, 351.

''We are therefore of opinion that complainants are entitled to recover for the gas furnished, upon an implied contract or upon a *quantum valebat.''*

In the case of *Land Co.* v. *Jellio,* supra, the city of Jellio, at a special meeting of the board of aldermen, let a contract to the London & New York Land Company to grade one of its streets. The work was done and suit was brought by the contractor to collect. The city's defense was that this special meeting was called without notice to some of the alderman, and held in their absence, and therefore there was no lawful meeting, and the contract was invalid. The court readily recognized this contention, but held the city liable for the benefits received, the contract being shown to be fair and reasonable. In passing upon the question the court said:

"The result of the authorities upon the subject is that, as a general rule, every member of a municipal council is entitled to reasonable notice of special meetings, and that no important action can lawfully be taken at such meeting unless such notice has first been given, or unless the members not notified actually attend and participate in the business of the meeting. . .

"The present contract is confessedly subject to this general rule, and, being so, it was undoubtedly invalid, and nothing else appearing, the complainant would inevitably be repelled from court. There is another aspect of the case, however, that demands the consideration of the court.

"The contract was fair and reasonable in its terms, and was within the scope of the powers conferred upon the council for the improvement of streets; it soon became known to the members of the council, who permitted it to go unrescinded and unchallenged, and allowed the complainant to continue the work through several months to completion, in the belief that all was satisfactory, and with the unquestionable result of large and permanent advantage to the municipality.

"In such a case liability arises by implication of law, and payment must be made according to the benefits received. The law which always intends justice, implies a promise. *Hitchcock* v. *Galveston*, 96 U. S., 341; 1 Dillon, Mun. Corp. section 460; *Gas Co.* v. *San Francisco*, 9 Cal. 453; *Columbus Water Co.* v. *Columbus*, 15 L. R. A., 354; *Moore* v. *New York*, 73 N. Y., 238; *Schipper* v. *Auora*, 6 L. R. A., 318; *McDonald* v. *New York*, 23 Am. Rep., 144; *Gaslight Co.* v. *Memphis*, 93 Tenn., 612; *Dowell* v. *Portland*, 13 Or., 248.

"Since the price named in the invalid contract is shown to be entirely fair and reasonable, not only in view of the labor done, but also in reference to the benefits conferred it will be taken as the true measure of recovery."

In the case of *Keenan & Wade v. City of Trenton,* supra, the city cuncil of the city of Trenton purchased an electric light plant from Keenan & Wade. Under the charter of the city the power to purchase said plant could only be exercised by ordinance to be passed by the city council at two meetings by a majority vote. The city council undertook to exercise the power by the passage of a resolution simply. This court held that this departure by the city council from the method prescribed by the city's charter in purchasng said plant rendered the action of the city council invalid. It was held, however, that the city had the power to purchase, and that, delivery of the plant having been made by Keenan & Wade to the city, and the city having taken possession of the plant under the purchase, it was liable for its value; that the mere invalidity of that which was attempted in the exercise of the power to purchase did not prevent from attaching and continuing the city's obligation to pay implied from the transaction.

In line with the holding of this court in the foregoing cases is the great weight of authority. The cases in other jurisdictions upon this question need not be discussed with elaboration. The following cases and others however are in accord with the holding of this court upon said question: *Drainage Commissioners*

v. *Lewis,* 101 Ill. App., 150; *Lincoln* v. *Village of Grant,* 57 Neb., 70, 77 N. W., 349; *Ward* v. *Town of Forest Grove,* 20 Or., 355, 25 Pac., 1020; *Paul* v. *City of Kenosha,* 22 Wis., 226, 94 Am. Dec., 598; *Pittsburg, C. & St. L. R. Co.* v. *Bridge Co.,* 131 U. S., 371, 9 Sup. Ct., 770, 33 L. Ed., 157; *Hitchcock* v. *City of Galveston,* 96 U. S., 341, 24 L. Ed., 659; *Dawson* v. *Waterworks Co.,* 106 Ga., 696, 32 S. E., 907; *Ida Grove* v. *Grove Armory Co.,* 146 Iowa, 690, 125 N. W., 866; *Providence* v. *Providence Electric Light Co.,* 122 Ky., 237, 91 S. W., 664; *Forrest City* v. *Orgill* 8 Ark., 389, 112 S. W., 891.

Complainants, in their brief, rely on the holding of this court in the case of *Watterson* v. *Nashville,* 106 Tenn., 410, 61 S. W., 782. In that case Mr. Watterson had made a written contract with the board of public works of the city of Nashville to do the capentry work on a new city hall, and while engaged in the work he was ordered to make certain changes not intended in the original plan, which involved the use of more costly material; said excess cost being $2,500. Upon receiving this order he gave written notice to the board of public works that he would demand extra compensation, and his declaration alleged that the president of the board assured him that he would be paid when the contract was completed, He sued for this extra work, for which there was no written contract. The city demurred. Section 43 of the city's charter provided as follows:

"When in the opinion of the board it shall become necessary in the prosecution of any work to make alterations or modifications in the specificatons or plans

of a contract, such alternations or modifications shall only be made by order of the board, and such order shall be of no effect until the price to be paid for the same shall have been agreed upon in writing and signed by the contractor and approved by the board. The total cost of the work, with the addition of price agreed upon, shall not exceed the original estimate.''

Section 44 of the charter provided: ''No contractor shall be allowed anything for extra work cause by an alteration or modification unless an order is made or an agreement signed, as provided in the preceding section, nor shall he in any case be allowed more for such altertion that the price fixed by the agreement.''

It will be noted that in this case the charter of the city expressly prohibited the contractor from receiving compensation for such work unless the contract was made in writing. There was no such provision in the present charter of the city of Nashville which was the charter by which defendants were governed.

Complainants rely on a number of cases cited from other states, which they contend hold that contractors cannot recover where the contract is let in violation of the terms of a statute or charter provision. It would seem that some of the cases cited support their contention, while others are easily distinguished. It is not necessary, however, to analyze or discuss these cases, because we think the question involved is directly settled by our own cases.

It is next insisted by the appellant commissioners and the Equitable Surety Company, surety on the official bond of Commissioner Alexander, that the chancellor

erred in rendering a decree against them for $22,648, on account of the alleged unlawful purchase and upkeep of automobiles.

A decree was also rendered against the United States Fidelity & Guaranty Company, as surety upon the official bonds of Commissioners Howse, Andrews, Elliott, and Wilkerson, on this claim; but, as before stated, the United States Fidelity & Guaranty Company has compromised and settled all recoveries given against it on account of its alleged suretyship, and therefore it has not assigned error on any of the recoveries given against it.

The special commissioner found that all automobiles were purchased by the commissioners after due and legal advertisement, as required by the charter of the city, but reported that he found no authority given to the commissioners by the city's charter to purchase automobiles, operate, and keep the same in repair at the expense of the city; but, on the contrary, it is provided in section 15 of the city's charter that no commissioner shall receive any compensation other than that expressly provided, nor shall extra pay be allowed or received by any commissioner or officer of the city serving on any committee, agency, or commission whatever, when appointed to such service by the commissioner during his term of office: Provided, however, that whenever the duties of any of the comissioners shall required him to visit a point beyond the limits of Davidson county his reasonable expenses may be paid by the city after such payment is authorized by the board of commissioners by a duly enacted ordinance.

It is the contention of the complainants, and that view, it seems was accepted by the chancellor, that the city commissioners were without power or authority to purchase automobiles for their official use, and that the purchasing of these automobiles by said commissioners was equivalent to voting or allowing themselves compensation in addition to that provided by the charter, in violation of section 15 thereof, and further that the purchasing and use by them of automobiles for traveling within the limits of Davidson county was prohibited by section 15 of the charter.

We are of the opinion that such is not the proper interpretation and meaning of said section. Of course, the commissioners could not purchase with funds of the city automobiles for their own private use. The question to be determined here is whether or not they could legally exercise their discretion and purchase automobiles at the expense of the city for official use in looking after the city's affairs.

Commissioner Elliott testified that it was necessary for him to have an automobile to attend to his official duties. On this point he said:

"It would be just as reasonable to expect a farmer to farm without a mule as to expect me to attend to my duties without an automobile."

He stated that he had to go all over the city both day and night, had to go to the reservoir, up to the river to see that it was kept clear of dead cattle, etc.; that the city of Nashville was seven, eight, or nine miles from one end to the other, and that he had to travel all over the city to see about the breaks in pipes, cleaning of streets, etc.; that there was no superintendent of the

waterworks department for a long time while he was in office, and he had to give everything his active personal attention. He testified that it would seriously impair his efficiency as an officer of the city if he were not furnished with an automobile in the performance of his official duties.

Commissioner Wilkerson testfied that there was a great deal of paving being done under the abutting property act while he was a member of the board of commissioners; that to look after this and the necessary water connections, etc., he and Mr. Elliott had to go all over the city; that during the season they were laying sidewalks over the city, and he would give at least a couple of hours each day in going over the city to see about these. He testified that it was necessary for him to have an automobile to get about over the city and look after the various improvements and work being made and done under his supervision. He says he kept the automobile furnished him in the city's stables at night. He further testified that the car furnished him was used by all the various heads of his subdepartments in the performance of their official duties.

Commissioner Howse testified, in substance, that it was necessary for the mayor of the city to have an automobile for his official use, because a great many fraternal organizations and a great many business organizations from over the country met in the city, and the automobile furnished to him was frequently used by him for the benefit of these organizations, both fraternal and business; that he was chairman of the board of the Tuberculosis Hospital, and that it was necessary for him to make frequent trips to the hospital, and that

he used his automobile in conveying the city nurses and patients to and from the hospital; used it for inspecting the streets of the city, both those under construction and those under repair; used it in visiting the pumping station, the reservoir, and the city's parks, etc. He admitted that he sometimes used it in going to and from his summer home in the country and in visiting the club. He further testified that the heads of the various departments of the city were furnished with automobiles. He further testified that, in his judgment, the mayor of a city of the size of Nashville should be furnished an automobile, "if he is to be an up-to-date mayor." He testified that he was furnished with his first automobile by the old board of public works.

There was no finding by the special commissioner that the city commissioners acted fraudulently or corruptly in the purchase of automobiles for their use, and no evidence was introduced to that effect.

So we think the liability of the commissioners depends on whether or not the purchase of said automobiles was a matter within their discretion, because in all matters where discretion is lodged with the municipal authorities that discretion will not be reviewed or interfered with by the courts, and the courts will not undertake to decide a question which the law has made it the duty of municipal officers to decide. *Beazley* v. *Kennedy*, 52 S. W., 791.

Mr. Dillon, in his valuable work on municipal Corporations (section 439), has this to say:

"The officers of a municipal corporation are not liable for errors or mistakes of judgment in the per-

formance of acts within the scope of their authority, as to which they are empowered to exercise judgment and discretion in the manner of their performance, in the absence of malice or corruption or a statutory provision imposing liability."

In McQuillin on Municipal Corporations, section 376, it is said:

"Frequently powers are conferred upon municipal corporations, in general terms without specifications as to the time when, or manner in which, they are to be exercised. Obviously the execution of such powers involves the exercise of judgment and discretion, and therefore the general rule has obtained that, in the absence of collusion or fraud, courts will decline to interfere where an officer or agent in the execution of the power is acting within the scope of his prescribed authority. In such case, any method which is fit and proper, with a due regard to the nature of the power, may be employed."

In the case of *East St. Louis* v. *United States,* 110 U. S., 321, 4 Sup. Ct., 21, 28 L. Ed., 162, the court said:

"But the question what expenditures are proper and necessary for the municipal administration, is not judicial; it is confided by law to the discretion of the municipal authorities. No court has the right to control that discretion, much less to usurp and supersede it."

We are of the opinion that it was within the power of the city commissioners to determine whether or not automobiles were necessary for the official use of themselves and the heads of the various departments under them, and, having exercised their discretion

in this matter, without any fraudulent or corrupt motive, their action cannot be reviewed by the courts.

In results, therefore, that the chancellor's action in holding them and the surety of Commissioner Alexander liable for the cost and upkeep of the automobiles purchased by them was erroneous.

It is next insisted that the chancellor erred in rendering a decree against Commissioner Howse, Treasurer Myers, and their sureties on their official bonds, for the expense of a trip to New York in 1914, and against Commissioners Howse and Wilkerson, Treasurer Myers, and their sureties, for the expense of a trip to New York in 1915.

These were two trips made to New York by said parties to deliver bonds of the city of Nashville to the purchasers thereof. In one instance $500,000 worth of bonds were signed and delivered in New York, and in the other approximately $1,000,000 worth of bonds were signed and delivered. The evidence shows that the mayor and secretary had to sign these bonds, and if they had signed them in Nashville and forwarded them to the purchasers in New York by express the rate would have been 75 cents per $1,000. Upon this basis it costs $475 more to deliver the bonds in New York through this committee than it would to have delivered them by express. However, in the expense of one of these trips it appears that the expense of Commissioner Wilkerson is included. The evidence shows that he went along on one of the trips to New York for the purpose of inspecting some streets in New York and Buffalo, with the view of acquiring

information as to the proper method of repairing and building streets.

It appears that the parties making these trips stopped at the Waldorf, and that Mayor Howse gave a dinner to some of the bankers, and also gave the party a trip to Chinatown. Just what the dinner given at. the Waldorf and the trip to chinatown costs does not appear.

Commissioner Howse testified that he personally furnished the money to defray the expenses of the second trip. This was the trip on which $465 was. expended. Commissioner Howse testified that he drew the money to defray the expenses if this trip from the firm of Howse Bros., and that the city had paid no part of it back to him.

We are of the opinion that the chancellor committed error in decreeing a recovery for the expenses of these trips to New York. We think it was within the discretion of the city commissioners to determine whether these trips were proper and necessary. While the sum total of these expenses was large, we cannot say that it is unreasonable, especially in view of the fact that the expense of Commissioner Wilkerson is included, which augmented the expenses of the party. Really the only items about which serious complaint is made are the expenses of the dinner at the Waldorf and the trip to Chinatown given by Mr. Howse. As before stated, it does not appear what the expense of these two items were. The court is of the opinion that it would be unjust to the defendants to charge them with the entire expense of said trips, because of these two items, which were, we think improper charges against the city.

It is next insisted that the chancellor erred in rendering a decree against Andrews and Myers and the United Surety Company on account of the alleged embezzlements of the city's funds.

The assignments of error filed by the defendants Andrews and Myers are general, and do not point out wherein or how the chancellor erred, nor wherein said defendants were prejudiced by said decree, and will not be further noticed.

The decree is attacked by the United Surety Company under its assignments of error from 4 to 6, inclusive.

By assignment No. 4 it is insisted that the chancellor erred in overruling said defendant's exceptions to the commissioner's report, based on the alleged erroneous admission of the testimony of W. C. Perry; the auditor having charge of the examination of the books of the city, and who testified on behalf of the complainants. The specific grounds of the defendant's exceptions are as follows:

(1) The report of the commissioner as to the amount of these alleged embezzlements is based on the testimony of W. C. Perry and certain *ad valorem* taxpayers, and in none of these is there any proof as to who got the money, or any portion of it, or how they got it.

(2) That the report is based on Perry's testimony, which consisted of summaries or results testified to from city records, etc. That this evidence was inadmissible, because the records were not offered in evidence, and the parties making the entries in said records were not called to testify as to their correctness or their absence excused, and the witness did not undertake to state the extent of the stortage shown on each book or set of

books as kept by or under the control of the separate defendants sought to be charged. All of said evidence was duly excepted to.

(3) That the special commissioner's report is based on Perry's testimony, which is an admitted compilation by one not familiar with the facts, or books, or false entries, and not a compilation from the true books, to fix the amount of embezzlements or abstractions against the parties keeping same, or those under whose control the same were.

In Cyc. vol. 17, p. 511, the rule with reference to proving results of voluminous facts contained in a writings, or of the examination of any books and papers or records, are to be proved, and the necessary examination of this documentary evidence cannot be conveniently or satisfactory made in court, it may be made by an expert accountant, or other competent person, and the results thereof may be proved by him, if the books, papers, or records themselves are properly in evidence, or their absence satisfactorily explained. It seems, however, that the jury are not bound by the results thus ascertained but may make their own calculations from the books and papers in evidence.

In *Louisville Bridge Co.* v. *Louisville, etc., Co.,* 116 Ky., 258, 75 S. W., 285, 25 Ky. Law Rep., 405, it was held that tabulated statements of the results of voluminous documents were admissible when the original documents were subject to the examination of the adverse party.

To the same effect is the holding of the court in *Railroad* v. *Keyes* (C. C.), 91 Fed., 47.

Burns v. City of Nashville.

But it is insisted in the instant case that the witness Perry did not testify from records which were accessible, but was testifying as to results of a compilation and audit made by numerous parties acting under him and Mr. Cameron, which was made. from certain city records, which were accessible, and from reports, examinations, and efforts to reproduce records which were missing.

It appears from the evidence that Mr. Cameron and his staff, of which the witness Perry was a member, were employed by the city as special auditor for the city to audit its books, and these books were turned over to them by the city as the books of the city, and after that time, and up to the time that Mr. Perry gave his testimony, these books were under the control of this auditing staff. The witness Perry testified that the branch of the investigation with reference to shortage in the city's treasury was under his charge as supervising accountant; that he did ascertian the shortage occurring from 1909 to 1914; that these investigations were made and results learned from the city records; that he had direct supervision of all this part of the investigation, and participated in making the investigation; and that he arrived at a correct result and proved each of the items.

It further appears that, upon the beginning of the examination of the witness Perry in regard to these alleged embezzlements, demand was made by counsel representing the defendants for the production of the books. It was impracticable to produce the books, because the witness testified that the books would take

up one-half of the chancery court room in which the hearing was being conducted; and it was stated by special counsel for the city, Mr. Malone, that there were certain suits pending in the third circuit court, where the city had sued, and it was expected to use the city books and records as evidence in those suits. Mr. Malone further stated that said books and records were arranged systematically in vaults at the city hall in layers and sections, and that if a subpœna *duces tecum* was issued, and these records brought over to the chancery court room, they would never be gotten straight again, and that he thought it was a proper suggestion that an adjournment be taken to the city hall, where these records could be examined without being moved, and stated that such a course would be entirely agreeable to him. It was further stated by Mr. Malone that the room adjoining the vault where these records were being kept was vacant, and that the hearing could be held there without inconvenience. Thereupon, by consent of the parties, the hearing was adjourned to the room in the city hall adjoining the vault in which the books were, and could be produced if called for and restored to their proper places. At the city hall the witness Perry was asked to give the figures on the alleged abstractions, and he gave them by years and the total, which was the same shown in the commissioner's report. The witness testified that the figures were correct. He testified that he knew the work of the men under him was correct, because he had proved it; that he had proved all the footings that were done by the men working under him and found

them correct; that he kept a certain control account all the time and determined that they had reached the correct result. He was asked to produce this control account, and it was brought from the vault, and, so far as the record shows, every record, book, or paper that was called for by counsel for the defendants was produced. The record discloses that the defendants had full and ample opportunity to examine any book, record, or paper about which the witness Perry testified.

As a part of Perry's system in making the investigation, it was shown that the county and city tax assessors had for mutual convenience worked jointly, and had interchanged books, which showed practically the same parties and generally the same valuations. In developing the abstractions, where books had been burned and destroyed, Perry went to the county tax assessor and secured from his office a list of the city taxpayers assessed by the county. He then sent to these parties and secured, from all who were willing to give them up, the tax receipts, showing the amount of the various taxes they had paid. Those who would not give them up furnished to city detectives and other agents of the auditing committee copies or memoranda of the amount of the taxes paid by them. The latter aggregated the amount of $12,903 for the year 1912, and $8,486.33 for the year 1913. Upon objection being made during the testimony of Perry as to these amounts, the objection was sustained by the commissioner, and thereupon the complainants issued subpœnas *duces tecum,* and brought in to court the tax receipts, and had them testified to and

142 Tenn.—39.

shown in open court, and made exhibits by the taxpayers themselves, aggregating the sum of $8,875.24 in the year 1912, and $4,394.57 in the year 1913. The witnesses testifying to matters going to make up these amounts were about seventy-five in number.

As against this proof no countervailing proof was introduced. The embezzlements were testified to by the defendant West, one of the participants therein, and, while he did not know the extent of the embezzlements, he testified that he was sure that they amounted to between $30,000 and $50,000.

We are of the opinion that there was no error in the admission of the testimony of the witness Perry on account of the city books, records, and papers, not being offered in evidence. We think the examination of the witness was conducted in the only practical way, and the defendants had full opportunity to examine the books, records, and papers about which Perry testified; they being in the vault adjoining the room where the testimony was being taken.

It is next insisted that the testimony of Perry was inadmissible, because the parties making the entries in the city books and records, about which he testified, were not called to testify, or their absence accounted for.

The complainants were not bound to call the alleged embezzlers as witnesses to testify as to entries bearing upon their alleged abstractions, because it could hardly be expected that they would have given testimony which would tend to incriminate them, and which would aid the complainants in an effort to recover the funds they had embezzled. Nor do we think that complainants were

required to introduce the subordinates of these alleged embezzlers to prove entries in said books and records.

It was held in the case of *Bank* v. *Bank,* 108, Tenn., 380, 381, 68 S. W., 497, that it was not necessary to introduce the bookkeeper, who made the entries in the books of the banks, to testify as to their correctness, because, at most, he could only testify that the entries made by him were true entries of transactions reported to him by others.

In the case of *Heike* v. *United States,* 227 U. S., 131, 33 Sup. Ct., 226, 57 L. Ed., 450, it was held that books in which were entered the weights of importations of sugar by city weighers were admissible in evidence in the prosecution against the officers of a sugar refining company for conspiracy to commit an offense against the United States, without calling the weighers who had made the entries to prove the books.

It is next insisted by the United Surety Company, under its fifth assignment of error, that the chancellor erred in rendering judgment against it for the sum of $5,266.71, as the surety for City Treasurer Myers for the year 1909, on account of embezzlements by him alleged to have been made during that year, because:

(1) The decree for said amount was given jointly and severally against said defendant and the United States Fidelity & Guaranty Company, as sureties, when as a matter of fact they were on entirely separate bonds for different portions of the year 1909.

(2) Because said decree was against the preponderance of the evidence.

It appears that the United Surety Company and the United States Fidelity & Guaranty Company were on separate bonds for the year 1909, and that the bond of the United Surety Company expired October 24, 1909, when Myers entered upon a new term of office, at which time he gave bond with the United States Fidelity & Guaranty Company as surety.

Under the system adopted by Andrews, West, and Murray, their embezzlements consisted, not of abstracting the city's funds from the bank in which they were deposited, but of intercepting payments made by taxpayers, issuing receipts therefor, and not recording their payments on the books.

No proof was offered tending to show, and there was no finding by the commissioner, as to when the defalcations of Myers occurred, whether before or after the bond of the United Surety Company expired.

In R. C. L. vol. 22, section 203, the rule is clearly stated as follows:

"The principle that, where an officer holds for more than one term and furnishes different sets of sureties for each term, the sureties, on the bond given for the term when the defalcation occurs are alone responsible, is of special importance when there is no clear evidence as to whether a particular defalcation occurred during one or other of the successive terms of such officer. The rule has been laid down that, where the officer fails to account for and pay over to his successor the funds chargeable to him as shown by his books and final account, the sureties on the last bond are *prima-facie* liable therefor, and, to relieve themselves, they must

show that the defalcation in fact occurred during a prior term.''

In Cyc. vol. 29, p. 1458, it is said: ''Where an officer serves several successive terms, and has a bond with different sureties for each term, the sureties on the bond for the last term are responsible for money in the hands of the officer at the time of the execution of such bond, and it will be presumed that the principal had in his hands as bailee money which he ought to have had at the beginning of the term covered by the bond.''

To the same effect are the cases if *Weakley* v. *Cherry Twp.*, 62 Kan., 867, 63 Pac., 433;[1] *Readfield* v. *Shaver*, 50 Me., 36, 79 Am. Dec., 692; *Pine County* v. *Willard*, 39 Minn., 125, 93 N. W., 71, 1 L. R. A., 118, 12 Am. St. Rep., 622; *Heppe* v. *Johnson*, 73 Cal., 265, 14 Pac., 833; *Fox Dist. Twp.* v. *McCord*, 54 Iowa, 346, 6. N. W., 536.

It results that the chancellor erred in rendering a decree against the United Surety Company for the defalcations of the defendant Myers

The sixth and last assignment of the United Surety Company is as follows:

''The chancellor erred in rendering judgment against this appellant for $10,000 for alleged shortage, because it was bondsman for Andrews, comptroller, from the year 1909 to 1911, in that:

'' (1) There is no competent evidence to sustain same.

'' (2) There should not have been entertained in this cause any matters involving the old mayor and city council of Nashville or its officials.

---

[1] Reported in full in the Pacific Reporter; reported as a memorandum decision without opinion in 62 Kan., 867.

"(3) The acts of Andrews in participating in the fruits of this peculation, while possibly furnishing the basis of a personal judgment against him, do not warrant a judgment against this appellant, because same were not official acts."

The first contention made under this assignment has already been fully discussed in disposing of previous assignments of error.

The second contention is too indefinite, and will not be further noticed.

The substance of the third contention is that the bond of Comptroller Andrews does not cover the alleged embezzlements by him, because he was not responsible for the receipt, custody, or disbursement of city funds; that responsibility being solely that of the city treasurer.

The record disclosed that it was a part of the duties of the city comptroller to credit daily the accounts of taxpayers and others by the sums paid by them the previous day to the treasurer; to issue to all persons entered as creditors on his books the warrants, in the form prescribed by Smith & McAllister's Digest, on which such persons may obtain payment by the treasurer; to charge up each day amounts paid by the treasurer on the previous day on his (comptroller's) warrants; and to do all other things usual and necessary for the proper administration of his office and the protection and security of the city, and such other duties as the mayor and city council might from time to time prescribe. These duties of the comptroller are prescribed by section 42 of Smith & McAllister's Digest of the City of Nashville.

The evidence shows that it was due to the failure of Comptroller Andrews to credit daily the accounts of taxpayers and others by the sums paid by them the previous day to the treasurer that the embezzlements of the city funds by him, Myers, West, and Murray were made possible.

Their operation and co-operation was outlined by West as follows: It was necessary, in order to carry on the system of abstractions that the witness West described, to have the co-operation of West, Treasurer Myers, Comptroller Andrews, and Auditor Murray. If one of the three had dropped out and refused to co-operate, the abstractions could not have proceeded. The abstractions began in 1909, and continued until the fall of 1913, when they ceased because Murray refused to go on with them.

The duty with reference to the system employed by these parties shows that checks would come into the city in payment of revenues due from taxpayers. The checks would be put in a drawer, and cash to the same amount as the face of the checks taken out, and the checks not entered for some time thereafter. A receipt was written out at the time, a blank receipt, and a false number put in the book by Comptroller Andrews. No entry was made in the book, and the check was sent to the bank to take the place of the cash that had been taken out of the cash drawer when the check was put in.

We think it is apparent from these facts that there was a breach of Andrew's official bond, for which the defendant United Surety Company is liable. The obligation of the bond is that—

"The said Lyle Andrews shall well and faithfully perform the duties of comptroller, agreeable to the laws, ordinances, and charter of the corporation aforesaid, during his continuance in office."

It was by reason of the breach of this obligation that the loss to the city occurred.

It is also said by counsel for defendant that this bond was not proved.

This statement is erroneous, because the bond was attached to the third amended bill as Exhibit O, was identified by the witness Dashiell as a copy which he himself had made and furnished for use as an exhibit to the bill, and it was also stipulated that, in lieu of producing and proving the original bond, the stenographer should copy into and as a part of the record the copy of the bond attached to the bill as Exhibit O.

Here it may be further said, on the action of the chancellor in refusing said defendant's application for a jury, that evidence was offered by the complainants which showed liability on the part of said defendant, and it offered no countervailing evidence to rebut that offered by the complainants, and the record does not disclose that it had any evidence that it could offer.

We are of the opinion, therefore, that the chancellor's action, even if it could be held erroneous, was not prejudicial to said defendant, and no reversal could be had therefor. Chapter 32, Acts 1911; rule 14, subsections 4 and 6, of this court, 126 Tenn., 722, 160 S. W., ix.

As to that portion of the chancellor's decree adjudging a recovery against the defendants Andrews, Myers, and West for the sum of $45,000, cost of the re-

construction and reproduction of the books of the city of Nashville destroyed by said defendants, and against the United States Fidelity & Guaranty Company, surety on the official bonds of Andrews and Myers for a like amount, there is no specific assignment of error made by Andrews and Myers showing wherein the decree of the chancellor is erroneous. They do file a general assignment of error, in which it is stated that the chancellor erred in rendering a decree against them; but they do not undertake to point out in what particular the decree is erroneous.

The United States Fidelity & Guaranty Company, as before stated, compromised and settled the decree rendered against it, and it has not, therefore, assigned any errors on this branch of the chancellor's decree.

The defendants Andrews and Myers did not testify, and the undisputed evidence shows that it cost the city the sum of $45,000 to reproduce the books and records destroyed, and that this was necessary to ascertain the extent of the embezzlements by said defendants, and the true financial condition of the city. We therefore think there is no error in the chancellor's decree allowing said recovery.

It is next insisted by all of the defendants assigning errors that the chancellor erred in rendering a decree against them for the sum of $905, cost of the transcript of a portion of the testimony furnished the chancellor by J. C. Morelock, court reporter, and in taxing this item as a part of the costs of the cause.

We think this action of the chancellor was manifestly erroneous. There is no provision for the payment of a

stenographer for his services by either party to the litigation, except that contained in sections 4695, and 4697 of Thompson's Shannon's Code. Those sections provide that, upon the request of either party, the judge of any court of record shall appoint a competent stenographer, who shall be sworn, etc., and that the party alone at whose instance the stenographer was employed shall be responsible for his compensation for the work done by him . The transcript in question was ordered by the chancellor before any proof was taken, and upon it being announced by him that he would tax the cost of said transcript as a part of the costs of the cause exceptions were made by the defendants. Exceptions were also later made at the hearing.

It is insisted by complainants that this was a matter within the discretion of the chancellor.

We do not think so. We think the chancellor was without power or authority to order the transcript made at the cost of the defendants and over their exceptions.

It is next insisted that the chancellor erred in enjoining the appellant commissioners from disposing of any of their property, and in not dissolving said injunction, because there was no proof that they had purchased any property with moneys belonging to the city.

The defendant commissioners denied this allegation of the bill in their answers, and there was no proof offered by the complainants to support it. It is therefore manifest that the chancellor erred in leaving the injunction in force and effect and in not dissolving it.

We think this disposes of all the assignments of error filed by the several defendants to the decree of the

chancellor. It results that said decree, as to all re-coveries given against the several defendants, will be reversed, and the bill dismissed, except as to recoveries decreed against the defendants Andrews, Myers, West, and the United Surety Company, as surety for de-fendant Andrews, on account of the alleged abstraction of the city's funds, and recoveries decreed against the defendants Andrews, Myers, and West on account of the destruction of the city's books and records, and those decreed against these same defendants on account of salary overdrafts. The decree as to these recoveries is affirmed.

The costs of the cause, including the compensation allowed the special commissioner T. J. Bailey, will be paid out of the fund now in this court in said cause, and if this fund is not sufficient to pay the entire costs, including the compensation allowed the special commis-sioner, then this court reserves the right to make further orders as to the costs.